The **BOARD OF ELECTION COMMISSIONERS OF CHICAGO et al., Defendants and Third-Party Plaintiffs-Appellees,**

v.

The **LIBERTARIAN PARTY OF ILLINOIS, Third-Party Defendant-Appellant.**

No. 78–1926.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1978.

Decided Jan. 11, 1979.

As Modified March 2, 1979.

Sheldon R. Waxman, Chicago, Ill., for appellant.

Richard A. Devine, Chicago, Ill., for appellees.

Before FAIRCHILD, Chief Judge, and SWYGERT and TONE, Circuit Judges.

TONE, Circuit Judge.

The Libertarian Party of Illinois appeals from an order of the District Court approving proposed "two-tier" plans for ballot placement in Cook County, Illinois, in the 1978 general election and finding the plans to be in compliance with our decision in *Sangmeister v. Woodard*, 565 F.2d 460, 467 (7th Cir. 1977). The challenged plans, submitted by the defendant Chicago Board of Election Commissioners for the City of Chicago and the defendant County Clerk of Cook County for the areas of the county outside Chicago, provided for a lottery to determine the order of "established political parties," *i. e.*, parties that respectively polled at least five per cent of the vote at the last election, in the top ballot positions. The other parties on the ballot, "new political parties," which became eligible to appear on the ballot by filing petitions, were placed, in the order in which they filed their petitions, below the established political parties.[1] The result of the two-tier system was that the first two places on the ballot went to the Republican and Democratic Parties. The Libertarian Party argues that this system favors the major parties and therefore violates the equal protection clause of the Fourteenth Amendment to the United States Constitution and state law. We hold that the system satisfies the Constitution as interpreted in *Sangmeister* and affirm the decision of the District Court.

*Sangmeister*, decided by this court on November 7, 1977, held the ballot placement

---

1. The two classifications of political parties are borrowed from the Illinois election statute. Ill. Rev.Stat. ch. 46, § 10–2 (1977) defines an "established political party" as

A political party which, at the last general election for State and county officers, polled for its candidate for Governor more than 5% of the entire vote cast for Governor, . . . as to the State and as to any district or political subdivision thereof.

or as

A political party which, at the last election in any congressional district, legislative district, county, township, school district, park district, municipality or other district or political subdivision of the State, polled more than 5% of the entire vote cast within such congressional district, legislative district, county, township, school district, park district, municipality, or political subdivision of the State, where such district, political subdivision or municipality, as the case may be, has voted as a unit for the election of officers to serve the respective territorial area of such district, political subdivision or municipality, . . . as to such district, political subdivision or municipality.

The term "new political party" includes all other groups which have complied with the petition-filing requirements of § 10–2.

practice of Cook County and two other Illinois counties violative of the Fourteenth Amendment. The practice of the county clerk in each of those counties, and apparently in all other counties in Illinois, was simply to place the candidates of his party in the top positions on the ballot. The Board of Election Commissioners did the same in the City of Chicago. Our decision was based on the District Court's findings, supported in the record, that the top position on a ballot is advantageous in an election and that therefore the challenged practice amounted to intentional discrimination against the candidates of opposing political parties. 565 F.2d at 465–467. *See also Bohus v. Board of Election Commissioners*, 447 F.2d 821 (7th Cir. 1971). We held, however, that the remedy imposed by the District Court in one of the consolidated cases decided by our opinion, by which the court required the use of a rotational system for determining ballot placement in Cook County, was too restrictive. We noted that other systems, consonant with the Constitution, were in use elsewhere. Recognizing that each county had individual problems that would make one permissible system more practicable than others, we deferred to the expertise of the election officials. We remanded the case, instructing the District Court to order the defendants to adopt constitutionally valid ballot placement procedures in accordance with guidelines set forth in the opinion. 565 F.2d at 467–469.

Subsequently the Cook County election officials proposed plans embracing the two-tier system of ballot placement described above. The District Court entered an order on June 5, 1978, approving the plans as in conformity with the *Sangmeister* guidelines and directing that they be carried out. On June 9 the Libertarian Party of Illinois, a third-party defendant which had theretofore been quiescent, filed a motion to reconsider the June 5 order. The court then held an evidentiary hearing concerning the reasons for the two-tier system and denied the motion. The Libertarian Party appealed from the order denying the motion and the June 5 order. The appellees are the Cook County Clerk, the Board of Election Commissioners of Chicago, and the State Board of Elections. While there are references in the latter's brief to counties other than Cook, only the plans in Cook County are before us.

■ Although the defendants do not argue that, because the 1978 general election has already been held, the case is moot, it is appropriate to note that *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), answers any question of mootness. The Court there held that a challenge to ballot access restrictions was not mooted after the election, because the burden of such restrictions "remains and controls future elections . . . . The problem is therefore 'capable of repetition, yet evading review.'" *Id.* at 816, 89 S.Ct. at 1494, quoting *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). The same is true with respect to the challenged procedure in the case at bar. Consequently the Libertarian Party's claim is not moot.

■ Appellant argues that Illinois law does not authorize the two-tier ballot placement system. This argument was not asserted in the petition for reconsideration in the trial court and may not be raised for the first time on review.[2]

■ A successful challenge to a ballot placement procedure under the equal pro-

---

2. In any event, the plans under consideration are specifically authorized and directed by Regulation 76—3 adopted by the State Board of Elections in 1976 pursuant to authority granted the Board by Ill.Rev.Stat. ch. 46, § 1A–8 (1977). (We may take judicial notice of the regulation, called to our attention by the Board in its brief.) The only statutory requirement with respect to order of candidates on the ballot is that they shall be listed in the order in which they have been certified by the State Board of Elections.

*Id.*, § 16–3 (or in the case of certain candidates who have filed petitions directly with the Clerk, the order in which the petitions are filed). *See id.*, § 10–6. It is apparently the practice of the State Board to certify all candidates for all counties of the state at the same time, and this appears to be permissible under the statute. *Id.*, §§ 7–60, 10–14. The Board advises us in its brief, filed before the 1978 general election, of its intention to do so for that election and to make the certifications in conformity with its

tection clause requires a showing of "an intentional or purposeful discrimination by authorities in which one class is favored over another." *Bohus v. Board of Election Commissioners, supra,* 447 F.2d at 822, quoted in *Sangmeister v. Woodard, supra,* 565 F.2d at 465.[3] In *Sangmeister,* this requirement was expressed, in the guidelines for proceedings on remand, as mandating that "[t]he procedure adopted . . . be neutral in character." Different treatment of minority parties that does not exclude them from the ballot, prevent them from attaining major party status if they achieve widespread support, or prevent any voter from voting for the candidate of his choice, and that is reasonably determined to be necessary to further an important state interest does not result in a denial of equal protection. *Cf. Buckley v. Valeo,* 424 U.S. 1, 93–97, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

Appellant has made no showing that the two-tier ballot placement system it attacks is designed to favor the major political parties or their candidates over new political parties and their candidates.[4] All the evidence in the record supports the conclusion that its purpose was to prevent voter confusion, to serve voter convenience, and, less important but still relevant, to aid in the convenient tallying of results.

Election officials have good reason to adopt a ballot format that minimizes confusion. Because of the large number of county offices, in addition to state and national offices, the ballot in Cook County contains many names and many descriptions of offices. Voting in a general election in Cook County demands considerable attentiveness and concentration on the part of voters. As we explain in more detail in the margin,[5]

Regulation 76—3 and the order of the District Court in this case. It presumably did so, for appellant does not advise us otherwise. The county officials had authority to determine the positions of the major party candidates. *Id.,* § 16–3. Thus, if the issue were properly before us, we would be unable to find any basis for appellant's argument that the action of the election authorities was not authorized under Illinois law.

3. The other requirement stated in *Bohus,* that of a showing that high placement on the ballot is an advantage in an election, has already been met in an earlier stage of the case at bar, as appears from *Sangmeister.*

4. Appellant does not complain on appeal of the method of determining, within the two-tier system, the sequence of ballot positions among new political parties. Its attack is aimed at the placement of the established political parties in the first two places on the ballot.

5. The record contains a sample of the voting machines format used in the City of Chicago on November 2, 1976. (Apparently the ballot for the November 1978 general election was not available when the record was made, but the ballot format did not change materially.) The format is a grid, on which each party's entire slate of candidates occupies a horizontal row. At the far left end of each horizontal row, the respective party's name is printed in large type. Each vertical column contains at the top a description of a contested office and underneath it a list of all the candidates for the office. The parties, in order starting with the

top ballot position, are Democratic, Republican, Communist, Socialist Labor, United States Labor, Socialist Workers, and Libertarian, followed by a row for independent candidates. Sixty columns are available for listing candidates for office. Three of these, 11, 19, and 26, are blank. All other columns contain candidates for office. The Democratic row of candidates fills all 60 columns. The Republican row of candidates fills all columns up to and including 54. The Socialist Workers row fills the first 9 columns. All other parties fill the first 8 columns. There are independent candidates in only the first column.

In a petition for rehearing, the Libertarian Party, for the first time, advises us that two of the minority parties that appeared on the ballot in the 1976 general election were not on the ballot in the 1978 general election and argues that the 1976 ballot is not representative. Ordinarily, new arguments are not entertained on rehearing, but in any event the omission of two of the minority parties from the ballot would not alter our decision.

A vote of the active members of the court was requested on the suggestion for rehearing in banc. A majority* of the active members of the court have voted to deny a rehearing in banc and a majority of the judges on the original panel have voted to deny the petition for rehearing. Except for the foregoing modification of the opinion, the petition of third-party defendant-appellant for rehearing and suggestion for rehearing in banc is DENIED.

* Judge Luther M. Swygert voted to grant the petition for rehearing and rehearing in banc.

only the two established political parties run candidates for all or substantially all of the offices to be filled. If ballot placement of all political parties were determined by lottery, the likely result would be large gaps on the ballot between the names of competing candidates for numerous county and judicial offices, which would confuse many voters and perhaps in practical effect cause some voters not to exercise a choice for the offices involved. In addition, there was evidence that leaving gaps between candidates would make it more difficult for election judges to read and record results.

An additional problem exists in Chicago because of limitations of space on the voting machines. With the two major parties at the top of the ballot, the judicial retention portion [6] fits into the block of space left by the short slates of the minor parties. If that block is cut up, as would be likely if a lottery of all parties were used for ballot placement, the judicial retention portion would have to be relegated to a separate paper ballot, with substantial added expense, inconvenience to voters, and delay in counting ballots. Even if it would be possible to crowd the judicial retention portion of the ballot into the gap between the two major parties, the resulting arrangement would be most confusing.

Our examination of the voting machine ballot format in evidence satisfies us that the placement used did avert a very real risk of voter confusion and also, in Chicago, where voting machines were in use, probably made it possible to avoid the undesirable alternative of handling the judicial retention balloting by a separate paper ballot. Not only would the separate ballot involve substantial public expense but it would make the recording of results more burdensome and probably less accurate and would probably result in fewer retention votes being cast.

The Supreme Court has recognized that distinctions between major and minor political parties do not necessarily violate the equal protection clause. The Court has upheld the constitutionality of statutes requiring candidates not nominated by major parties to obtain given numbers of signatures on petitions before being placed on the ballot. *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *American Party of Texas v. White*, 415 U.S. 767, 782 n.14, 94 S.Ct. 1296, 39 L.Ed.2d 744 (and accompanying text) (1974). *Cf. Buckley v. Valeo*, 424 U.S. 1, 96, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Among the justifications for sustaining these requirements was the most important of the interests the two-tier system at bar was designed to serve, *viz.*, avoidance of voter confusion. Unless this "important," 403 U.S. at 442, 91 S.Ct. 1970, and, "admittedly vital," 415 U.S. at 782 n.14, 94 S.Ct. 1296, interest is protected, the result may be "frustration of the democratic process," 403 U.S. at 442, 91 S.Ct. 1970, quoted in 415 U.S. at 782 n.14, 94 S.Ct. 1970.

It can be said of the challenged ballot placement system that, like the nomination procedure approved in *Jenness v. Fortson, supra*, 403 U.S. at 439, 91 S.Ct. at 1975, it "in no way freezes the status quo, but implicitly recognize[d] the potential fluidity of American political life." Under Illinois law, a new political party may become "established" by polling more than 5 per cent of the vote at an election. See note 1, *supra*.

The Illinois Election Code fairly protects the opportunity of new political parties to be placed on the ballot and, indeed, gives them a timing advantage over established political parties that could improve their election prospects. Although a new party must obtain 25,000 signatures on petitions, it need not file the petitions until three months before the general election, Ill.Rev. Stat. ch. 46, § 10–2 (1977), after the identities of the major party candidates are known. Major parties must file their petitions three months before the primary, *id.*,

6. The judicial retention portion of the ballot, Ill.Rev.Stat. ch. 46, § 16–6.1 (1977), including title and instructions occupies columns 20 through 60 of rows 3 through 6 (the rows occupied by the Communist, Socialist Labor, United States Labor, and Socialist Workers parties).

§§ 2A–1.1, 7–5, in which new parties are not required to participate. Thus, although Illinois treats established and new political parties differently, it affords different advantages to each group which reasonably correspond to their needs and to the interest of the public in an open election with convenient and intelligible ballots.

There remains the question of whether voter confusion and the other legitimate objects of the two-tier system might not have been achieved by listing the two major parties together on the bottom two lines of the ballot instead of the top two lines. In the case of Chicago's voting machines, this would have caused the description of each office, which appeared on the top line of the ballot, to be separated from the names of the candidates for the office by the judicial retention portion of the ballot; or, in the alternative, it would have required dropping the description of the offices for which only two parties presented full slates down to a line below the judicial retention portion. Either alternative would have made the ballot more confusing, and, of course, at the same time relegated the major parties to the bottom of the ballot instead of the new parties. Moreover, given that it was highly desirable if not necessary, in the interest of preventing voter confusion, to place the two major parties on adjacent lines at the top or bottom of the ballot, we think that it was permissible to choose the alternative that would make the ballot as convenient and intelligible as possible for the great majority of voters, who, history indicated, would wish to vote for a candidate of one of the two major parties.

Like the denial of public financing to some candidates in *Buckley v. Valeo*, the different treatment of minority parties and candidates in the case at bar is not a barrier to a candidate's placement on the ballot and is not restrictive of voters' or candidates' rights. 424 U.S. at 94, 96 S.Ct. 612. The relatively slight disadvantage that may result from placement below the top two ballot positions is more than outweighed by the state's interest in assuring the quality of the election.

By requiring in *Sangmeister* that "[t]he procedure adopted should take account of all political parties involved, major and/or minor," 565 F.2d at 468, we did not direct the District Court to impose a lottery system in which all political parties would participate on the same basis. Rather, we recognized the need for flexibility that would enable "each clerk . . . [to] adopt a ballot placement procedure well suited to the specific needs of each county," and the complexity of the issue and the need to consider "such problems as computer programming, type of voting device, possible combinations of ballots for printing, size of voting units, etc." 565 F.2d at 468. If we had intended to confine the state election officials to placement of all parties according to a single lottery we would have said so. A ballot placement system that places the major parties, each of whose candidates received substantially more votes than the candidates of minor parties at the preceding election, and who run full slates of candidates, in the top ballot positions, in an order determined by lottery, does not offend the equal protection clause, provided that the system is not adopted to disadvantage the minor parties but to improve the quality of the election.

In conclusion, we find that the two-tier system of ballot placement authorized by the District Court is a reasonable solution of the problems faced by the election officials and has not been shown to be the product of invidious discrimination. It is consistent with our instructions in *Sangmeister* that the procedure be neutral in character and take into account all political parties involved, major and minor.

The judgment is affirmed.

AFFIRMED.

SWYGERT, Circuit Judge.

I have the misfortune of finding myself in dissent from the majority opinion. Although there may be sufficient reasons for treating "major" and "minor" political parties differently in terms of getting on the ballot initially, once ballot status has been achieved it is unjustifiably discriminatory to

give one type preference over the other. This court said as much in *Sangmeister v. Woodard*, 565 F.2d 460, 468 (7th Cir. 1977). Unfortunately, the majority does not follow this precedent and unsupportably extrapolates from others in reaching an opposite conclusion.

The mandate issued in *Sangmeister* was clear. We ordered

the defendants to devise a constitutionally permissible ballot placement procedure. In adopting a procedure, the County Clerks should abide by the following guidelines:

1) The procedure adopted *must be neutral* in character. This court *will not accept a procedure that invariably awards the first position on the ballot* to the County Clerk's party, the incumbent's party (*see Mann v. Powell*, 333 F.Supp. 1261, 1267 (N.D.Ill.1969) (three judge court)), or the *"majority" party.*

2) *The procedure should take account of all political parties involved, major and/or minor.* While we need not decide whether the district court's order to exclude minor parties from the rotational selection procedure was valid, we recognize that there may be serious questions about its constitutional propriety.

\* \* \* \* \* \*

565 F.2d at 468 (emphasis added). "Neutral" at the least means not favoring one over another, and the clear import of the two guidelines taken together is that this court will not accept a procedure which invariably favors major parties over minor ones. By approving a procedure which prevents a minor or "non-established" party *as such* from ever attaining the top ballot position, the majority has effectively negated the order of this court in *Sangmeister.*

The cases invoked by the majority as authority for this negation are inapposite. They do not deal with the issue of ballot position; instead, they are concerned with such topics as qualifications to receive public funding for campaigning, *e. g., Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), or requirements for merely getting on the ballot to begin with, *e. g., Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). Although there may be adequate reasons for discriminating between major and minor parties regarding access to public funds or nominating procedures, once the effects of these discriminations have been overcome and a minor party has achieved ballot status, further discrimination based solely on a party's major or minor status is invidious[1] and therefore violative of the Equal Protection Clause.

Apart from the citation to case authority, the majority supports its conclusion by rationalizing that the "quality" of the election is somehow enhanced by a ballot placement procedure justified through considerations of cost, convenience, and a lessening of confusion. But, given the importance in a democratic society of elections which both are and appear to be fair and impartial, it is difficult to see how a procedure which invariably keeps minor parties as such from the advantages of top ballot position can be said to enhance an election's quality. Certainly the importance of cost and administrative convenience must surrender to constitutional considerations. And the arguments centering on voter confusion tend to prove too much. By focusing on the alleged inability of voters to appreciate the fact that candidates listed in the same vertical column but separated by a number of lines are yet running for the same office, these arguments point out the disadvantages which parties separated by a number of

---

1. Nor does reference to the Illinois election statute mitigate the discrimination. Like much of the majority's case authority, the statute discriminates between "established" and "new" political parties with reference to the requirements for eligibility to appear on the ballot. That the particular classifications developed for this purpose were "borrowed" to provide the means of discrimination between the tiers of the proposed placement procedure adds nothing to a discussion of the constitutional propriety of that discriminatory procedure. If anything, it serves to highlight the temptation to justify the instant discrimination by reference to inapposite authority, a temptation to which the majority has succumbed.

lines from the top of the ballot must endure. That, on a given ballot, some parties must be so disadvantaged is unavoidable; there is, after all, only one top spot. It is possible, however, to give each party, whether major or minor, an equal chance to attain that top spot on a given ballot.[2] To realize an election procedure of this quality requires a system which takes into account both major and minor parties and which is neutral in character, meaning that it does not invariably favor one classification of party over another. That is the system which this court ordered in *Sangmeister*, and it is not the system which has been put before us here. Accordingly, I would reverse the decision of the district court with directions once again to follow the dictates outlined in *Sangmeister* and reiterated here.

---

**2.** We are informed that in 1976, DuPage County, Illinois, successfully utilized a procedure that gave all parties which had achieved ballot status an equal opportunity to be listed at the top of the ballot. The County of Cook and the City of Chicago may well have their own set of local problems, but the success of the 1976 DuPage County procedure does prove that an inclusive, neutral system can be devised. We recognized in *Sangmeister* that a variety of solutions are possible and in fact stated that the clerks "should feel free to adopt any *constitutional* procedure . . . ." 565 F.2d at 468 (emphasis added). But we also ordered that the procedure must be neutral and take account of all political parties, major and minor. *Id.*