**G. Oliver KOPPELL, et al., Plaintiffs,**

**v.**

**NEW YORK STATE BOARD OF ELECTIONS, et al., Defendants.**

No. 98 Civ. 4920(SHS).

United States District Court, S.D. New York.

Aug. 7, 1998.

Fred Isquith, Wolf, Haldenstein, Adler, Freeman & Hery, New York City, for plaintiffs.

Joel Graber, NYS Attorney General's Office, Todd Valentine, Albany, NY, for defendants.

## OPINION

STEIN, District Judge.

Plaintiffs G. Oliver Koppell—a Democratic candidate for Attorney General—and Arnold Linhardt and Marie Morrison—two New York State voters—brought this action challenging the constitutionality of the lottery by which the position of candidates on the ballot is determined for primary elections in New York State counties outside of New York City. Plaintiffs seek an order (1) enjoining defendant New York State Board of Elections from conducting the lottery to determine the placement of candidates' names on the ballots for party primaries that will be held on September 15, 1998, and (2) directing that the positions of candidates' names on primary ballots outside New York City be rotated in the same fashion as they are within in New York City.

The action was commenced on July 13; ten days later this Court heard argument and conducted an evidentiary hearing on plaintiffs' motion for a preliminary injunction.[1]

*Plaintiffs' Claims*

New York State law provides two different methods for determining the placement of candidates' names on primary election ballots. In counties outside New York City, New York Election Law § 7–116(3) provides that a lottery will determine ballot placement.[2] Election Law § 7–116(6) provides that within New York City, ballot position is to be rotated by election district "so that each name shall appear first and in each other position in an equal number, as nearly as possible, of the election districts..." N.Y. Election Law § 7–116(6).

Plaintiffs advance three claims to support their position that the lottery violates their constitutional rights. First, they contend that Election Law § 7–116(3) infringes plaintiffs' right to vote, because each vote cast in support of a lottery loser is devalued in comparison to each vote for the lottery winner. Plaintiffs ground their dilution argument in the Fourteenth Amendment's equal protection provision. *See* Plaintiffs' Mem. at 11. Second, they assert that the statute burdens the plaintiffs' First Amendment right to freedom of association because "the statute ha[s] diminish[ed] the purpose of their association, a fair chance of victory at the polls." Plaintiffs' Mem. at 16. Finally, plaintiffs contend that the statute infringes the right to candidacy.

Plaintiffs' legal claims rest on one essential factual claim: the existence of a phenomenon known as "position bias," which results in a certain number of votes, sometimes called the "windfall vote," being cast for the candidate whose name appears first on the ballot, solely by virtue of the candidate being listed

---

1. The parties have agreed that the factual record on this motion for a preliminary injunction includes the affidavits and exhibits submitted in support of plaintiffs' motion for injunctive relief, those submitted in support of a cross-motion by defendants to dismiss the complaint, the testimony elicited from plaintiffs' expert, Professor Henry Bain, at the evidentiary hearing, and certain affidavits submitted following that hearing.

A lottery was held on August 3, 1998, pursuant to Election Law § 7–116(3). Mr. Koppell drew the fourth position of four candidates for the office of Attorney General. That part of plaintiffs' motion which seeks to enjoin that lottery is therefore denied as moot. This Opinion addresses plaintiffs' motion for an order that a rotation system be implemented for ballots upstate.

2. New York Election Law § 7–116(3) provides, in relevant part, that "[t]he officer or board with whom or which are filed the designations for a public office or party position shall determine by lot ... the order in which shall be printed on the official primary ballot, under the title of the office or position, the names of candidates for public office..."

in that first ballot position. According to plaintiffs' expert, Professor Henry Bain, "[t]he advantage appears to result from the voters' insufficient information about the candidates, and their insufficient motivation to inform themselves and make a careful choice. These insufficiencies are especially great in primary and non-partisan elections, in which voters lack the assistance of party labels, and the media provide less information than in general elections." (Affidavit of Henry Bain ("Bain Aff."), ¶ 3).

According to Professor Bain, the rotation system in place·in New York City "produces a situation that is ideal, from the point of view of the researcher, for ascertaining whether the first ballot position is favored by the voters," (Bain Aff., ¶ 11), because the researcher can compare the percentage of votes candidates receive in election districts where they are in the first ballot position with percentages of votes they receive in other election districts. Examining the results of the Democratic Primary for the New York State Attorney General race in 1994 in the borough of Queens, New York City, Professor Bain found that the "position effect" there was "equal to what would be found if 4.7 percent of the voters automatically and blindly voted for whoever was listed first, while all of the remaining voters were unaffected by any tendency to vote for the first candidate." (Bain Aff., ¶ 15). Professor Bain was unable to state that he had any direct knowledge upon which he could extrapolate that 4.7% result in Queens to the rest of New York State. (Transcript of July 23, 1998 Hearing ("Hrg.Tr.") at 59–61).

*The Standards for Injunctive Relief*

Pursuant to *Jackson Dairy v. H.P. Hood & Sons*, 596 F.2d 70 (2d Cir.1979), a party seeking injunctive relief generally must demonstrate that it will suffer irreparable harm in the absence of injunctive relief, and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the preliminary relief. *Id.* at 72. However, "[w]here a moving party challenges government action taken in the public interest pursuant to a statutory or regulatory scheme ... the moving party cannot resort to the 'fair ground for litigation' standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits." *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996) (citations and internal quotation marks omitted).

Furthermore, a heightened showing—a "clear" or "substantial" showing—of likelihood of success must be made "where (1) the injunction sought 'will alter, rather than maintain, the status quo,'—i.e., is properly characterized as a 'mandatory' rather than 'prohibitory' injunction; or (2) the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996) (citing *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)). Both those circumstances are present here.

*Irreparable Harm*

For the purposes of this motion, this Court is willing to assume that plaintiffs have satisfied the irreparable harm prong of the *Jackson Dairy* test. Should the primary election go forward pursuant to the current law, any infringement on plaintiffs' constitutional rights would be irreparable, unless a court were to take the extraordinary step of invalidating the results of the election. *See Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir.1986) (noting that plaintiffs "would certainly suffer irreparable harm if their right to vote were impinged upon").

*Likelihood of Success on the Merits*

For the purposes of this analysis, this Court also assumes—without making a finding—that the phenomenon of position bias exists and has an effect on New York State primary elections. Nevertheless, plaintiffs have failed to establish a likelihood of success (and therefore, have failed as well to establish a clear likelihood of success) on the constitutional aspect of their claim and they therefore cannot prevail on this motion.

All the parties to this litigation agree that the analysis set forth by the United

States Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), applies to this case. *Anderson* provides that when entertaining challenges to state election laws, a court

> must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by the rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Id.* at 789, 103 S.Ct. 1564. The Supreme Court has clarified the *Anderson* analysis in *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), where it wrote that pursuant to the standard set forth in *Anderson,*

> the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' ... But when a state election law provision imposes only 'reasonable nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions.

*Id.* at 434, 112 S.Ct. 2059 (citing *Anderson*).

■ The burden imposed upon candidates and voters by the upstate lottery system is minimal. Indeed, one court has found that any injury resulting from position bias "is not a constitutional concern," in the context of an arguably more burdensome ballot placement statute. *See New Alliance Party v. New York State Board of Elections*, 861 F.Supp. 282, 295 (S.D.N.Y.1994).[3] Compared to other

burdens on voting rights, the burden imposed on candidates by the lottery is minor. This is not a case where any candidate is denied access to the ballot, *see, e.g. Anderson*, 460 U.S. at 792, 103 S.Ct. 1564 (striking down Ohio's early filing deadline which had the effect of excluding late-filing independent candidates from the ballot), or where a regulation precludes a voter from voting, *see, e.g. Dunn v. Blumstein*, 405 U.S. 330, 360, 92 S.Ct. 995, 31 L.Ed.2d 274 (striking down residency requirement of one year in state and three months in county). The lottery does not infringe on First and Fourteenth Amendment rights by "freez[ing] the status quo." *Jenness v. Fortson*, 403 U.S. 431, 438, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

■ Nor is it a case where the one person, one vote principle is offended. Contrary to plaintiffs' arguments, votes cast in support of lottery losers are not "diluted" by the lottery in the same sense that votes cast by voters in larger-than-average election units can be diluted by vote-counting systems. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). In reapportionment cases, the "victims['] ... votes actually count for less representation." *New Alliance*, 861 F.Supp. at 296. Such is not the case here. Position bias, unlike the dilution of votes caused by drawing of election districts or by vote-counting systems, is not the ineluctable product of the state's election system. Position bias depends on such factors as the amount of "information and encouragement [voters receive] on how they should vote" and voters' "motivation" (Hrg. Tr, at 60), and thus can be ameliorated by voter education about the candidates. (*See* Supplemental Affidavit of Henry Bain, ¶ 4).

To the extent that plaintiffs contend that the lottery losers are forced to work harder to educate voters to overcome the "head start" afforded to the lottery winner, the cases addressing ballot nomination petition statutes are instructive. In *Schulz v. Williams*, 44 F.3d 48 (2d Cir.1994), the Second Circuit reviewed a statute requiring that

---

3. In *New Alliance*, the statute at issue provided for the positioning of candidates from "independent bodies" *after* all those from "political parties." *New Alliance*, 861 F.Supp. at 284.

ballot nomination petitions for "independent bodies" include each signer's election district, and, where applicable, assembly district or ward. The Court "recognize[d] the plaintiffs' evidence that vote canvassers spent 50% to 70% of their time processing these numbers," but concluded that "that fact alone does not make the burden 'severe.' ... '[H]ard work and sacrifice by dedicated volunteers are the lifeblood of any political organization.'" *Id.* at 57 (quoting *American Party of Texas v. White,* 415 U.S. 767, 787, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974)). To conclude that position bias is insurmountable would be to abandon "faith in the ability of individual voters to inform themselves about campaign issues." *Anderson,* 460 U.S. at 797, 103 S.Ct. 1564. To the extent that position bias remains a factor, even after the candidates' efforts to educate voters, "an irrational vote," or even an uninformed, confused, or apathetic vote, "is just as much of a vote as a rational one." *New Alliance,* 861 F.Supp. at 297.

"The Constitution does not protect a plaintiff from the inadequacies or irrationality of the voting public; it only affords protection from state deprivation of a constitutional right." *New Alliance,* 861 F.Supp. at 295. Here, while state action is concededly involved in establishing a system for ballot placement, it is nondiscriminatory.[4] While it may not be the ideal system for limiting the effects of position bias, the lottery system provides every candidate with an equal chance to achieve the top ballot placement.

There is no discrimination by, for example, party affiliation or in favor of incumbents or of candidates from the party that prevailed in the last election. Many courts have considered such discrimination a prerequisite to a Fourteenth Amendment challenge to ballot placement schemes. *See Strong v. Suffolk County Board of Elections,* 872 F.Supp. 1160, 1164 (E.D.N.Y.1994) (plaintiff bringing position bias claim pursuant to Fourteenth

Amendment "must prove the existence of an intentional or purposeful discrimination by authorities in which one class is favored over another"); *see also Board of Election v. Libertarian Party,* 591 F.2d 22, 24–25 (7th Cir. 1979) ("A successful challenge to a ballot placement procedure under the equal protection clause requires a showing of 'an intentional or purposeful discrimination by authorities in which one class is favored over another' ") (citation omitted); *Sangmeister v. Woodard,* 565 F.2d 460, 465 (7th Cir.1977) ("First, the plaintiff must 'show that top placement on the ballot is an advantage in an election...' Second, the plaintiff must 'prove the existence of an intentional or purposeful discrimination by authorities in which one class is favored over another.'"); *Libertarian Party of Colorado v. Buckley,* 938 F.Supp. 687 (D.Colo.1996) (denying motion for preliminary injunction against ballot placement scheme; noting that scheme "is facially neutral"); *but see, e.g. McLain v. Meier,* 637 F.2d 1159, 1167 (8th Cir.1980) (noting that "most courts have applied the rational basis test"). Other courts have even found that such discriminatory ballot placement schemes do not warrant relief. *See, e.g., Gilmore v. Gardner,* 1994 WL 529922, at *3—*6 (D.N.H.1994) (denying motion for preliminary injunction ordering ballot rotation and enjoining system of assigning top ballot spot to candidate from party which received greatest number of votes at last state general election); *Clough v. Guzzi,* 416 F.Supp. 1057, 1067–68 (D.Mass.1976) (upholding incumbent-first method of ordering names on ballots); *but see, e.g., Graves v. McElderry,* 946 F.Supp. 1569, 1576 (W.D.Okla.1996) (striking down Democrat-first statute).

Indeed, some courts have ordered that a lottery be conducted as a remedy when other methods for determining ballot placement have failed constitutional scrutiny. *See Culliton v. Board of Election Commissioners,*

---

4. Plaintiffs' allegation that the statute burdens their First Amendment right to associate for political ends appears to be derivative of their argument that their votes are diluted by the lottery. Because, as explained above, there is no likelihood or clear likelihood that plaintiffs will succeed in establishing a violation of their Fourteenth Amendment rights, this Court cannot find a likelihood or clear likelihood that plaintiffs will

succeed in showing a violation of their First Amendment rights. To the extent that the two claims are distinct, the Court notes that its analysis of the nature of the burden applies equally to both claims; in neither case are the plaintiffs likely to be able to show that such a minimal burden outweighs the state's asserted regulatory interests.

419 F.Supp. 126 (N.D.Ill.1976) (enjoining Republican-first system; noting that rotation is fairest procedure, but ordering lottery given imminence of election); *Mann v. Powell,* 314 F.Supp. 677, 679 (N.D.Ill.1969) (directing "drawing of candidates' names by lot or other nondiscriminatory means by which each of such candidates shall have an equal opportunity to be placed first on the ballot").

This Court cannot conclude that plaintiffs are likely or clearly likely to succeed in showing that Election Law 7–116(3) is unconstitutional. Even if this Court ultimately were to differ with Judge Ward's conclusion in *New Alliance* and to conclude that position bias is "a constitutional concern," any burden which position bias does place on constitutional rights is minimal and is likely to be justified by the "the State's important regulatory interests." *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059. Defendants have asserted that the dual system in effect in New York State furthers the state's interest in home rule and in local control of elections. (Hrg. Tr., at 25–26). Although this interest may not be sufficient to justify a more serious violation of First or Fourteenth Amendment rights, it is likely that ultimately it would be found more than sufficient to justify the minimal burden here. *Libertarian Party of Colorado v. Buckley,* 938 F.Supp. 687, 693 (D.Colo.1996) ("While the State offered little in the way of evidence to support its justifications for enacting its ballot position plan, its recognized interest in regulating elections is sufficient to outweigh any 'position bias' claimed by Plaintiffs.").

The lottery system may be a less than ideal system for determining ballot placement. However, given that any burden created by that lottery system is not an absolute bar to candidacy or to the franchise, can be ameliorated or overcome through voter education, and that positions are allocated by non-discriminatory means, this Court cannot conclude that plaintiffs are likely to succeed on the merits of their claim, much less clearly likely to succeed. Accordingly, plaintiffs' motion for a preliminary injunction is denied.