**NEW ALLIANCE PARTY, Lenora A. Fulani and Rafael Mendez, Plaintiffs,**

v.

**NEW YORK STATE BOARD OF ELECTIONS, Libertarian Party, Democratic Party, Republican Party, Conservative Party, Right to Life Party, and Liberal Party, Defendants.**

No. 90 Civ. 6226 (RJW).

United States District Court, S.D. New York.

Aug. 30, 1994.

Gary Sinawski, New York City, for plaintiffs.

G. Oliver Koppell, Atty. Gen., Judith T. Kramer, Joel Graber, Asst. Attys. Gen., Peter S. Kosinski, Sp. Counsel, NY State Bd. of Elections, New York City, for defendant NY State Bd. of Elections.

Mark N. Axinn, New York City, for defendant Libertarian Party.

Gerard E. Harper, Glenda G. Grace, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Democratic Party.

Jeffrey T. Buley, Albany, NY, for defendant Republican Party.

ROBERT J. WARD, District Judge.

In this action challenging the constitutionality of N.Y.Elec.Law § 7–116 ("Section 116"), plaintiffs New Alliance Party ("NAP"), Lenora B. Fulani, and Rafael Mendez move for summary judgment, pursuant to Rule 56, Fed.R.Civ.P. Defendant New York State Board of Elections (the "State") cross-moves for an order, pursuant to Rule 12(b)(6), Fed. R.Civ.P., dismissing the complaint for failure to state a claim upon which relief can be granted.[1] For the following reasons, NAP's motion is denied, the State's motion is granted and the Court finds that Section 116 does not deprive plaintiffs of their constitutional rights.[2]

## BACKGROUND

Under New York Election Law, there are two varieties of political organizations—"parties" and "independent bodies." A "party" is defined as "any political organization which at the last preceding election for governor polled at least fifty thousand votes for its candidate for governor." N.Y.Elec.Law § 1–104(3). On the other hand, an "independent body" refers to "any organization or group of voters which nominates a candidate or candi-

dates for office to be voted for at an election, and which is not a party as herein provided." Id. § 1–104(12). While independent bodies are not subject to any organizational requirements, parties must maintain state and county committees of elected representatives and must conduct primary elections in the event more than one person seeks its nomination for public office. NAP is an independent body that has fielded candidates for federal and state office since its formation in 1979. It, along with its chairperson and one of its supporters, alleges that Section 116, New York's ballot placement statute, is unconstitutional.[3]

Section 116 provides two methods for arranging political candidates on the ballot in New York, one for the candidates of political parties, the other for the candidates of independent bodies. Pursuant to Section 116, party candidates are listed before independent body candidates, and are positioned in descending order based on their performance in the preceding gubernatorial election. N.Y.Elec.Law § 7–116(1).[4] At present, New York has five parties, and, as a result of their performance in the 1990 gubernatorial election, their order on election ballots for the subsequent four years has been as follows: (1) Democratic; (2) Republican; (3) Conservative; (4) Right to Life; and (5) Liberal. While Section 116 directs that the independent bodies follow the parties, it does not prescribe a particular method for arranging these candidates, and leaves the order of placement to the discretion of the State. Id. § 7–116(2).[5] Currently, the State deter-

1. The board also moved to dismiss the complaint, pursuant to Rule 12(b)(7), Fed.R.Civ.P., for failure to join the necessary parties, under Rule 19, Fed.R.Civ.P. The State asserted that disposition of the instant action in favor of plaintiffs would adversely affect the five established political parties, who were not originally included in the lawsuit. Subsequently, plaintiffs stipulated to joinder of these parties as defendants.

2. Throughout this opinion, the Court generally refers to plaintiff NAP in the singular, although technically this action has been brought as well by Fulani and Mendez.

3. Lenora Fulani, NAP's national and state chairperson, was also its candidate for president in 1992 and its candidate for governor of New York in 1986 and 1990. Rafael Mendez is a registered voter in New York State, who supported NAP in

the 1992 election and seeks to support its candidates in the future.

4. N.Y.Elec.Law § 116(1) reads in full:

In printing the names of candidates on the ballot, the candidate or candidates of the party which polled for its candidate for the office of governor at the last preceding election for such office the highest number of votes shall be in column A or one and the candidates of the other parties shall be placed on such ballot in descending order of such votes.

5. N.Y.Elec.Law § 7–116(2) provides in pertinent part:

The officer or board who prepares the ballot shall determine the order in which shall appear, below the names of party candidates the

mines the arrangement of independent bodies by a lottery.

When this action was instituted in 1990, NAP sought to challenge the States's discretionary authority and the methods it employed in positioning independent bodies on the ballot. On September 27, 1990, NAP brought an order to show cause for a preliminary injunction requiring the State to list all political organizations on the November 1990 general election ballot in descending order based on performance in the 1986 gubernatorial election. In particular, NAP claimed that it should be slotted sixth after the five parties because it had been the only independent body to run a candidate for governor in the 1986 election in which NAP received 24,100 votes. As a result of the lottery which was held on September 18, 1990, however, NAP placed third among independent bodies and was therefore to be situated in the eighth position overall.

This Court denied NAP's motion for a preliminary injunction on the ground that plaintiff failed to prove irreparable harm. *New Alliance Party v. New York State Board of Elections*, 1990 WL 155590 (S.D.N.Y. Oct. 9, 1990). Were the motion granted, the Court explained, NAP would have been slotted sixth rather than seventh. While case law has sometimes found that position advantage inheres in the first slot on the ballot, no case has held, nor did NAP submit evidence showing, that movement from one intermediate position to another closer to the first position confers an advantage on the candidate. The Court also noted that NAP might have had more support for its motion had the ballot remained as originally arranged after the lottery was conducted. Subsequent to the lottery, the second ranked independent body was removed from the ballot and NAP was switched from eighth to seventh position. This move was significant because in the 1990 gubernatorial election, New York City voting machines were arranged in horizontal rows of seven columns. Placement in the eighth slot, the

Court theorized, might have harmed NAP because it would have been positioned on the second horizontal row. ·

In the 1990 gubernatorial election, NAP received approximately 31,100 votes, the highest vote tally among the independent bodies.[6] Plaintiff then moved for summary judgment contending that the State's policy deprives the independent bodies of benefitting from positional advantage on the ballot in relation to their voting strength, something the parties enjoy. NAP claimed the board was discriminating against the independent bodies in violation of the Constitution under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. The Court denied the summary judgment motion on account of a disputed factual issue. *New Alliance Party v. State Board of Elections*, 1991 WL 196263 (S.D.N.Y. Sept. 25, 1991). As with the preliminary injunction motion, plaintiff's claim was premised on intermediate position advantage, and here too it neglected to offer any concrete evidence of such advantage. The Court, therefore, found that absent statistical evidence or expert testimony, plaintiff would be incapable of establishing the necessary foundation for its claims. *Id.* at *6. Although, at the end of its decision, the Court directed the parties to engage in discovery and submit a pre-trial order, the action was discontinued without prejudice by stipulation and order on May 29, 1992.

Then, on September 9, 1992, the State held its lottery for the presidential election to be held on November 3, 1992. Six independent bodies participated and NAP drew fifth place. Because the sixth ranked independent body failed to file timely acceptances, it was disqualified from being listed on the ballot and NAP fell to last place. As a result of the lottery, NAP was "double columned" or "double rowed" on the 1992 ballot in New York State. For that election, the State used two styles of voting machines. In New York City and the city of Albany, the ballot

nominations made only by independent bodies. . . .

**6.** Of the other two independent bodies running candidates for governor in 1990, the Libertarians

collected approximately 24,600 votes and the Socialist Workers Party got approximately 12,750 votes.

was arranged horizontally in a row of nine columns designated "A" through "H." Additional independent bodies were doubled-up under other independent bodies, and thus NAP in slot "J" was situated directly below Ross Perot's No Party in slot "G." Appendix A, *infra.* On all other ballots in the State, the voting machines listed candidates vertically in a column of nine rows. On this ballot, NAP was the only independent body doubled-up, also adjacent to the No Party. Appendix B, *infra.*

After its poor performance in the 1992 lottery, NAP once again decided to challenge New York's ballot placement statute through an order to show cause seeking a preliminary injunction. At oral argument held on October 9, 1992, plaintiff argued that it would suffer irreparable harm by its allotted placement on the ballot because of the space limitations that exist on voting machines in New York. Subsequent to oral argument, plaintiff withdrew its motion for a preliminary injunction, while the Court agreed to vacate the stipulation of discontinuance and grant plaintiff leave to serve and file a supplemental complaint.

Through its supplemental complaint, plaintiff now seeks declaratory and injunctive relief from the procedures employed by the State in listing and ordering all candidates for political office on the electoral ballot in New York. Specifically, plaintiff contends in Count I that the statutory scheme abridges its First and Fourteenth Amendment rights to cast an effective vote, to associate for the advancement of political ideas, and to create and develop a new political party. It also alleges, in Count II, that Section 116 violates the Equal Protection Clause of the Fourteenth Amendment, insofar as the statute denies independent bodies the same opportunity parties have to be listed in the first position on the ballot or even on the first row or column.[7] Plaintiff offers no empirical evidence in support of its claims, but asserts that ballot placement advantage is a self-evident fact. According to NAP, the Court need only glance at the ballots used in the

1992 election to determine that a doubled-up party is relegated to a confused, obscure and disadvantaged position.

As an alternative to Section 116, NAP proposes that a uniform method be applied to all political entities listed on a ballot or that a rotational system be devised whereby each entity qualifying for the ballot is assigned each position on the ballot in an equal number of voting districts. Plaintiff submits that twenty-seven states now provide for complete or partial ballot rotation. In New York State, however, the ballot rotation device is used only in New York City primary elections.

## DISCUSSION

■ A summary judgment motion may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). No genuine issue of material fact exists when no rational fact finder could find in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). However, in ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991).

■ On a motion for summary judgment, a movant has a heavy burden. He must show that the facts which would warrant granting the motion are undisputed because "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In making a summary judgment determination, therefore,

---

**7.** As part of Count II, NAP also alleges that Section 116's methods for assigning ballot placement are violative of 42 U.S.C. § 1983 inasmuch as they encourage the State, acting under color of state law, to deprive plaintiff of its constitutional rights.

the Court does not resolve disputed issues of fact but assesses whether material issues remain for the trier of fact. *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990).

■ To dismiss a complaint for failure to state a claim upon which relief may be granted under Rule 12(b)(6), Fed.R.Civ.P., it must "appear[ ] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). In ruling on the motion, a court must limit itself to the facts stated in the complaint, *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991), accept those facts as true, *Easton v. Sundram,* 947 F.2d 1011, 1014–15 (2d Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992), read the complaint generously, and draw all reasonable inferences in favor of the pleader. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989) (citing *Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 562 (2d Cir.1985)). In this action, plaintiff not only fails to prove that no genuine issue of material fact is in dispute but it is unable to prove any set of facts which would support the claims it has alleged.

## I. *Ballot Position Advantage*

■ Plaintiff's reconstituted challenge to Section 116 is predicated on a claim of "position bias," the frequently-held belief that "the candidate occupying the first position on the ballot will receive a substantial number of 'extra' votes from voters who are either uninformed or uninterested in the candidates and habitually ·select the first name on the ballot." *Ulland v. Growe,* 262 N.W.2d 412, 414 (Minn.) (en banc), *cert. denied sub nom, Berg v. Growe,* 436 U.S. 927, 98 S.Ct. 2822,

56 L.Ed.2d 770 (1978). Uninformed or indifferent voting behavior is referred to as the "windfall vote" or, at times, more derisively as the "donkey vote" inasmuch as those who vote randomly will often "uncritically check off whoever [sic] is at the top of the ballot, especially if the candidate is also an incumbent." *Clough v. Guzzi,* 416 F.Supp. 1057, 1063 (D.Mass.1976). In this action, NAP contends that windfall voting extends to the top row of a double-columned ballot, and that it is disadvantaged by position bias both because it has no chance of being slotted first on the ballot and because it has only a diminished chance of being listed in the top row.

Yet, plaintiff has tendered no empirical evidence in support of its claims. It has proffered no statistical studies or expert testimony demonstrating the existence of position bias and its effects on the outcome of an election in New York State nor has it submitted any evidence that a doubled-up candidate suffers because of position bias.[8] Instead, plaintiff argues that empirical evidence is unnecessary because it is beyond dispute that double columning or double rowing confuses voters and has a negative impact on the doubled-up party's performance in the election. NAP asserts that the Court may take judicial notice of the existence and effects of "position bias" because it is a "self-evident" feature of voter behavior, which is confirmed more by the worth society attributes to first position than any results deduced by a study or theory. NAP states:

> [S]ociety has attributed substantial significance to ballot position and placed a substantial value on ballot positions that are perceived to confer an advantage.... [I]t is difficult and perhaps misguided to seek underlying or intrinsic value in ballot position by means of statistical studies or similar empirical methodology. Rather the value of ballot positions that are perceived to confer an advantage can be empirically

---

**8.** All plaintiff offers in support of its claims is the uncorroborated and untested hypothesis of Thomas W. Wallace, former executive director of the State Board of Elections. Wallace stated at his deposition:

> I believe anyone who's double rowed will suffer there a potential confusion by voters. In addition, the confusion is heightened by the fact that the finger pointers which are required

carry the name at the beginning of the row or column, and if there is double rowing or columning, the two names are usually put in there. Again, I can't speak that well for New York City but outside of New York City this is the method and again it harms the identity of the simple independent body.

Sinawski Decl., Ex.D. at 70.

verified by the sociological fact that people attribute value to such positions.

Plaintiffs' Reply Memorandum at 8, n. 5.

However, courts have consistently held that the effect of ballot placement on election outcomes is a factual determination. *Sangmeister v. Woodard,* 565 F.2d 460, 465 (7th Cir.1977), *cert. denied and appeal dismissed sub nom., Illinois State Board of Elections v. Sangmeister,* 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1978); *McLain v. Meier,* 637 F.2d 1159, 1166 (8th Cir.1980). Indeed, this Court denied NAP's earlier motion for summary judgment precisely because plaintiff had failed to submit empirical evidence demonstrating the existence or effects of intermediate ballot position advantage. NAP seeks to distinguish its present challenge by arguing that it relies on a commonly-held belief. That position bias is a popular perception of the voting public, however, is not sufficient to exempt NAP from the burden of proving its claims. It certainly does not justify disposition on a motion for summary judgment which would preempt a jury from assaying a material issue of fact.

■ Judicially noticed facts are those which exhibit a high degree of indisputability. *McCormack v. Cheers,* 818 F.Supp. 584, 597 n. 14 (S.D.N.Y.1993). Under Rule 201(b), Fed.R.Evid., judicial notice encompasses facts that are either "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," or they are "generally known within the territorial jurisdiction of the trial court." In this Court's view, the existence and effects of position bias are not subject to judicial notice under either one of these standards.

A. *Capable of Accurate and Ready Determination by Resort to Sources whose Accuracy cannot Reasonably be Questioned*

1. *The Original View*

■ Academic studies and articles, as well as case law, have often adopted the view that position bias exists on an election ballot. The authoritative study on the subject is a report that analyzed the effects of ballot placement in Michigan city and county elections from 1951 to 1952. Henry M. Bain & Donald S. Hecock, *Ballot Position and Voter's Choice: The Arrangement of Names on the Ballot and its Effect on the Voter* (1957) [hereinafter Bain & Hecock]. This study formulated a statistical equation, which quantifies the advantages of being listed first on the ballot, while taking into account other factors that contribute to election performance. *Id.* at 47–54. Other studies following the Bain & Hecock model "have yielded almost unanimous results: all other factors being equal, the name appearing first in a list of candidates attracts a larger than random share of the vote." William James Scott, Jr., Note, *California Ballot Position Statutes: An Unconstitutional Advantage to Incumbents,* 45 So.Cal.L.Rev. 365, 366 (1972) (listing other studies and conducting its own study of California elections); *see also, Sangmeister v. Woodard,* 565 F.2d at 463 n. 3 (listing studies).

Based on similar statistical analyses provided by experts at a trial or hearing, some courts have declared state statutes or policies which reserve the first slot in a race to a particular candidate or party unconstitutional on account of position bias. Such schemes have included granting first place to the party that filed first, *Weisberg v. Powell,* 417 F.2d 388 (7th Cir.1969); arranging the ballot alphabetically, *Kautenburger v. Jackson,* 85 Ariz. 128, 333 P.2d 293 (1958); situating one's own party first, *Sangmeister v. Woodard, supra;* and allotting the first or left hand column to the party that had received the most votes in a previous election. *McLain v. Meier, supra.* Other schemes, however, have been held to be constitutional. *Ulland v. Growe, supra* (listing party candidates before those of independent bodies and ordering parties by performance in last general election); *Krasnoff v. Hardy,* 436 F.Supp. 304 (E.D.La.1977) (placing independent candidate to right of established parties on a horizontal ballot).

The most controversial ballot placement schemes have been the "incumbent first" statutes in which the incumbent in a particular race is guaranteed first position. Over twenty years ago, New York determined such legislation to be unconstitutional when it

struck down an amendment to the election law which afforded incumbents the first slot in all primary races. *Holtzman v. Power,* 62 Misc.2d 1020, 313 N.Y.S.2d 904 (Sup.Ct.), *aff'd,* 34 A.D.2d 917, 311 N.Y.S.2d 824 (App. Div.), *aff'd,* 27 N.Y.2d 628, 313 N.Y.S.2d 760, 261 N.E.2d 666 (1970). California's incumbent first legislation was also invalidated after expert testimony introduced at a trial demonstrated the advantages of top ballot placement. *Gould v. Grubb,* 14 Cal.3d 661, 665, 122 Cal.Rptr. 377, 536 P.2d 1337 (1975) (in banc). In fact, the experts who testified in *Gould* were Henry M. Bain and William James Scott, Jr., whom the decision characterized as preeminent authorities on the question of ballot placement preference. *Id.* at 667 n. 6, 122 Cal.Rptr. 377, 536 P.2d 1337.

## 2. *The Opposing View*

Nevertheless, not every authority or case has concurred with or unquestionably accepted the views advanced by Bain & Hecock. In fact, one study explicitly concluded that position bias did not affect election outcomes. Gary C. Byrne & J. Kristian Pueschel, *But Who Should I Vote for For County Coroner?,* 36 Jo. of Politics, 778, 781 (1974). The study states: "Contrary to much popular opinion and several earlier studies, first place on a ballot gives a candidate no advantage. One of the primary reasons for this discrepancy between our data and some of the earlier works, we suspect, stems from the failure to disentangle the effects of incumbency from the effects of ballot position." *Id.*

Indeed, some states have actually upheld "incumbent first" procedures precisely because of the varied and inconclusive effects of position bias on election outcomes. In Massachusetts, incumbents in both primary and final elections were not only listed first on the ballot, they were designated as candidates for re-election. *Clough v. Guzzi,* 416 F.Supp. at 1059 n. 1 (citing 53 Mass.Gen. Laws § 34 and 54 Mass.Gen.Laws § 41). When this ballot placement method was challenged, the court analyzed both written studies and expert testimony and concluded that whereas the designation of incumbency confers an advantage on the incumbent, plaintiff had not proved that a substantial advantage inheres in first ballot position alone. *Id.* at

1065–66. Moreover, in cases that have invalidated incumbent first mechanisms, such as *Gould,* courts were compelled to limit their findings of position bias to the "so-called 'low visibility' races, in which voters are more likely to be unfamiliar with many of the candidates." *Gould v. Grubb,* 14 Cal.3d at 668, 122 Cal.Rptr. 377, 536 P.2d 1337. Even those experts in *Gould,* who found position bias in most elections, would not go so far as to state that it existed in presidential or gubernatorial elections. *Id.*

Due to the indeterminate and imprecise nature of position bias, a multi-factored analysis must be employed in examining the effects of ballot position on election outcomes. Besides position bias, other factors, such as the visibility of the race, the number of candidates on the ballot, and the type of election—is it partisan or non-partisan contest and is it a primary or general election—often influence election outcomes. As one court summarized the findings of the expert testimony it received:

(1) Positional bias exists in most elections, but with a variable impact.

(2) Candidates' party affiliation is the single most important factor influencing a voter.

(3) Because of the importance of party affiliation, the effect of positional bias is considerably more pronounced in nonpartisan elections.

(4) The magnitude of positional bias tends to vary in inverse proportion to the visibility of a particular election. The less important (for whatever reason) the election, the greater the effect of positional bias.

(5) Numerous factors other than ballot placement, including sex, ethnic background, and age, can influence an uninformed voter.

*Ulland v. Growe,* 262 N.W.2d at 414–15.

Studies show that position bias is most evident in low visibility contests insofar as fewer voters in those races actually cast their votes out of preference for a particular candidate. Mark E. Dreyer, Note, *Constitutional Problems with Statutes Regulating Ballot Position,* 23 Tulsa L.J. 123, 127 (1987). In non-partisan and primary elections position

bias is more pronounced, because voters are not furnished with the party identification of the particular candidate which would enable them to make a more informed choice. *Id.* Yet, Bain & Hecock theorized that, "even in a general election, where the voters have more clearcut guidance provided by party labels in making their choice, there is considerable advantage to be gained by appearing in certain positions." Bain & Hecock at 14. As a result, some cases have even found that position bias exists on a general election ballot which is arranged by party affiliation. *See, e.g. Sangmeister v. Woodard,* 565 F.2d at 464 (affirming a trial court holding that ballot position preference inheres even in a general election ballot).

One recent study, however, determined that position effect does not occur at all in American general elections in which party listings serve as a cue on the ballot and where voters were asked to pick only one candidate among those running in a contested election. Robert Darcy, "Position Effects with Party Column Ballots," 39 *Western Political Quarterly,* 648, 661 (1986). In Darcy's view, previous court decisions that relied on earlier studies are problematic because the original studies failed to adequately distinguish the effects of ballot placement on partisan general elections as opposed to non-partisan and primary elections. Darcy writes:

> Existing research while failing to document position effects in American general elections suggests that such effects are nevertheless present. The weight of scholarly opinion, reinforced by political folklore, has led to a number of court decisions premised on ballot position effects in general elections [citing decisions].... These court decisions, along with legislative actions similarly premised, have led to a number of states adopting ballot rotation procedures. *There is, however, good reason for expecting position effects to be absent from American general elections.*

*Id.* at 651 (emphasis added).

Whether or not Bain & Hecock remains instructive and whether or not earlier case law is authoritative in examining the existence of placement effects on a ballot, it is clear that this Court cannot find that position bias is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Position bias is not a fact that can be easily determined, in the way that, for example, the fact that August 30, 1994 is a Tuesday can be verified by simply looking at a calendar. Position bias is a disputable fact because its existence is dependent upon the circumstances in which it operates. The advantage to being placed both in the first slot on the ballot and, by extension, in all slots along the top row of the ballot is not something that can be easily confirmed by looking at the 1992 ballot.

In fact, were this Court to attempt to determine the advantages or disadvantages of ballot placement by simply looking at the ballots used in New York in 1992, it might arrive at conclusions that contradict NAP's assertions. For example, it could be argued that on a horizontal ballot, such as exist in New York City and Albany, Appendix A, *infra,* the far right position is the most advantageous slot. Certainly, well-read newspapers, such as "The New York Times" and "The Wall Street Journal," have found it beneficial to situate the lead article in the far right column. Likewise, in the vertical ballot used elsewhere in New York in 1992, Appendix B, *infra,* NAP might have benefitted from being the only independent body doubled-up in the second column inasmuch as it is isolated and could invite attention. Finally, on both versions of the 1992 ballot, NAP was doubled-up under or adjacent to Ross Perot's No Party, which garnered 1,091,000 votes. *Statistical Abstract of the United States 1993,* at 265 (113th ed.).[9] Clearly, any column or row in which so many votes are tallied cannot be characterized as obscure. Moreover, that an avowed anti-incumbent, such as Perot, collected so many votes may mean that windfall voting is not necessarily monopolized by incumbents or major party candidates listed at the top of the ballot.

---

**9.** Although NAP asks this Court to invalidate Section 116 based on the format of the 1992 presidential election, plaintiff has submitted no results or statistics from that election.

### B. Generally Known within the Territorial Jurisdiction of the Trial Court

The more difficult question for this Court, however, is whether it should take judicial notice of position bias, in any event, because it is a fact which is "generally known within the territorial jurisdiction of the trial court" as is meant by Rule 201(b)(1), Fed.R.Evid. The parameters of this standard have not received much judicial attention. Nonetheless, courts appear to have invoked this basis for judicial notice for facts that reflect the common customs, practices and behavior of those residing within the geographical area of the court. For example, it was appropriate for a court in the Southern District of Florida to take judicial notice of the fact that many Hispanics in the area either did not speak English, were not citizens, or lacked some other prerequisites for jury duty. *United States v. Esle*, 743 F.2d 1465, 1474 (11th Cir.1984); *see also, Rivera Puig v. Garcia Rosario*, 785 F.Supp. 278, 281 (D.Puerto Rico 1992) (among other local facts, a court in Puerto Rico took judicial notice of the fact that no record is generally made of preliminary hearings conducted in Puerto Rico's courts and that the customary practice in the local courts is for lawyers to bring their own recording equipment).[10]

NAP argues the position bias must be subject to judicial notice within the territorial jurisdiction of this Court because, in *Holtzman*, a New York court characterized first place advantage on a ballot as a matter of common knowledge. That court stated: "Aside from the factual determination, such a belief [in the existence of position bias] appears to be so widespread and so universally accepted as to make it almost a matter of public knowledge." *Holtzman v. Power*, 313 N.Y.S.2d at 907. New York is not the only jurisdiction in which such a sentiment has been expressed. In 1958, the Arizona Supreme Court noted: "It has been recognized, we think correctly, that it is a common known and accepted fact that where there are a number of candidates for the same office, the names appearing at the head of the list have a distinct advantage." *Kautenburger v. Jackson*, 85 Ariz. at 295, 333 P.2d 293 (citing *Elliott v. Secretary of State*, 295 Mich. 245, 249, 294 N.W. 171 (1940) (finding this commonly known and accepted fact equally applicable to primary and general elections)).

California courts have also discussed the general knowledge justification for judicial notice of position bias. When mandamus actions were first brought in that state challenging the constitutionality of incumbent first procedures, the petitions were denied because of the existence of a factual dispute concerning the extent of preference that flowed to the top ballot position. *See, Mexican–American Political Ass'n v. Brown*, 8 Cal.3d 733, 106 Cal.Rptr. 12, 505 P.2d 204 (1973); *Diamond v. Allison*, 8 Cal.3d 736, 106 Cal.Rptr. 13, 505 P.2d 205 (1973). The California Supreme Court explicitly stated:

> The existence of the alleged preference is not a fact which is either of such common knowledge or which is subject to such accurate determination by resort to sources of reasonably indisputable accuracy that is not reasonably subject to dispute. Accordingly, it is not a fact properly the subject of judicial notice.

*Id.* 8 Cal.3d at 734 and 737, 106 Cal.Rptr. 12, 505 P.2d 204. However, Justice Tobriner dissented in those cases, and he authored *Gould*, which ultimately invalidated California's incumbent first procedure. Noting that position bias is a commonly known and accepted fact, Justice Tobriner commented: "Virtually all of the published empirical data supports this common sense proposition.... Under these circumstances, I believe this court ... should take judicial notice of the advantage accruing to a candidate placed first on the ballot." *Id.* at 735, 106 Cal.Rptr. 12, 505 P.2d 204 (Tobriner, J., dissenting).

Nevertheless, it must be emphasized that no court has ever based a finding of position bias on judicial notice. Both *Kautenburger*

---

**10.** Judicial notice under Rule 201(b)(1) has also been invoked with respect to facts that are so widely known that they transcend jurisdiction and could be recognized by courts anywhere in the country. *See, e.g., Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 n. 1 (2d Cir.1982) (taking judicial notice of the traditional characteristics of all snowmen because the traditional features of snowmen are widely known).

and *Holtzman* were based on factual findings made by a trial court or referee after hearing evidence on the subject. Even in *Gould*, which acknowledged the general existence of position bias, the trial court's findings were made after "a four-day trial at which both parties introduced considerable expert testimony on the question of whether or not a candidate gained any significant advantage by virtue of top ballot position." *Gould v. Grubb*, 14 Cal.3d at 666, 122 Cal.Rptr. 377, 536 P.2d 1337. Thus, notwithstanding *dicta* in some cases, it is not the practice of courts to take judicial notice of position bias. Rather, courts make a factual finding based on statistical evidence or expert testimony submitted at a trial or hearing.[11]

More importantly, that position bias has been viewed by some as common knowledge does not mean that it is necessarily subject to judicial notice. Not all commonly-held beliefs can be transformed into judicially-mandated beliefs that are immune from the adversarial process. By way of analogy, it may be a widely held view that cigarette smoking causes cancer, but courts do not simply take judicial notice of this fact to relieve a tort plaintiff from his burden of establishing liability on the part of a cigarette manufacturer. This causal predicate must be established through evidentiary methods. In cigarette tort litigation, courts have taken judicial notice, not of the commonly-held belief that smoking causes cancer, but of the existence of evidence implicating cigarette smoking as a cause of cancer. *Clemmons v. Bohannon*, 918 F.2d 858, 865 (10th Cir.1990); *Sias v. Secretary of Health and Human Services*, 861 F.2d 475, 479 (6th Cir.1988). However, even in taking judicial notice of the existence of this evidence, a court would not be bound to accept the truth of the matters asserted in such evidentiary materials. In other words, a court may take judicial notice of the 1989 Surgeon General's Report identifying tobacco as a carcinogen,

but the plaintiff would still have the burden of presenting evidence at trial to support the Surgeon General's findings and to demonstrate that the cancer he suffered from was, in fact, caused by cigarette smoking.

Likewise, if NAP had asked this Court to take judicial notice of evidence that supported a "widely accepted belief" of position bias, this Court might have been willing to do so. Such evidence, however, would not have relieved NAP of the burden of establishing at an evidentiary hearing that its constitutional rights have been severely burdened by New York's ballot placement methods. Moreover, even if such evidence were sufficient to establish position bias, it could not establish that a doubled-up party is at an inherent disadvantage. That phenomenon has never been characterized as a matter of common knowledge and further evidence would be required. In truth, position bias may be a commonly-held belief in this jurisdiction, but its imprecise and conditional nature preclude it from being characterized as a judicially noticed fact which is "generally known within the territorial jurisdiction of the trial court." Such knowledge refers to facts for which evidentiary support only needlessly burdens judicial time and resources, not disputed questions in which one side enjoys popular support.

## II. *Constitutional Analysis of Section 116*

 Even accepting plaintiffs' contentions of position bias, this Court need not find that Section 116 is constitutionally invalid. New York's election statutes, as with other state legislative enactments, have been afforded a strong presumption of constitutionality. *Velez v. Board of Elections*, No. 90 Civ. 5598 (JFK), 1990 WL 130767 (S.D.N.Y. Sept. 5, 1990). Although the presumption is rebuttable, "invalidity must be demonstrated beyond a reasonable doubt." *McGee v. Korman*, 70 N.Y.2d 225, 519 N.Y.S.2d 350, 352,

---

**11.** Empirical evidence has been viewed as instrumental in access to ballot claims, where a party challenges an election law provision limiting its opportunity to be listed on the ballot. "In appraising the collective burden imposed by access requirements, one must place substantial weight on empirical evidence demonstrating how often minority parties and independent candidates

have actually been able to satisfy them." Laurence H. Tribe, *American Constitutional Law*, 784 (1978). If in the access to ballot context, empirical evidence is needed, it is even more crucial in a position bias case where the challenge is based not merely on access to ballot but on the more attenuated claim of access to a preferred position on the ballot.

513 N.E.2d 236, 238 (1987) (citing *Wiggins v. Town of Sommers*, 4 N.Y.2d 215, 173 N.Y.S.2d 579, 582, 149 N.E.2d 869, 871 (1958)). To prevail on the constitutional claims alleged in their complaint, therefore, NAP would need to show beyond a reasonable doubt either that Section 116's dual method of ballot placement severely burdens a substantial constitutional voting right or that it distinguishes between the parties and the independent bodies in contravention of the Equal Protection Clause.

## A. *The Fundamentality of Voting*

Voting is integral to democracy. As the Supreme Court recently reaffirmed: "'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.'" *Burdick v. Takushi*, — U.S. —, —, 112 S.Ct. 2059, 2067, 119 L.Ed.2d 245 (1992) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964)). The Supreme Court has, as a result, derived a variety of constitutional voting rights from the First and Fourteenth Amendments including: the right to associate for the advancement of political purposes, *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958); the right to cast an effective vote, *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968); and the right to create and develop new political parties, *Norman v. Reed*, 502 U.S. 279, —, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). Although these rights have been classified as "fundamental," *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979), their fundamentality has been constrained by state supervision of the democratic process. *Burdick v. Takushi*, — U.S. —, 112 S.Ct. at 2063, 119 L.Ed.2d 245.[12] In this vein, "the right to vote" has been clarified to mean "the right to participate in an electoral process

that is necessarily structured to maintain the integrity of the democratic system." *Id.*

Subsumed within fundamental voting rights is a political party's right to have access to the ballot. *Williams v. Rhodes*, 393 U.S. at 29, 89 S.Ct. at 10. In *Williams*, the Supreme Court held that, in much the same way state regulation of elections cannot contravene an express provision of the Constitution, it cannot violate a right encompassed within the Equal Protection Clause of the Fourteenth Amendment. *Id.* In particular, *Williams* found that an Ohio provision, which made it significantly more burdensome for newer parties to gain access to the ballot, was a violation of equal protection. The Supreme Court identified access to ballot as a vital feature of democratic elections by stating:

> The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot.

*Id.* at 31, 89 S.Ct. at 10–11. Severe restrictions on access to ballot strike "at the core of the right of political association" by depriving a party of "[t]he right to have one's voice heard and one's views considered." *Id.* at 41, 89 S.Ct. at 16 (Harlan, J. concurring).

Subsequent to *Williams*, however, the Supreme Court has resolved to restrict the scope of access to ballot claims and has rarely found a state restriction to be a constitutional violation. States may limit the number of candidates that appear on the ballot as a way to prevent voter confusion. *Storer v. Brown*, 415 U.S. 724, 732, 94 S.Ct. 1274, 1280, 39 L.Ed.2d 714 (1974). States are allowed to winnow the field of candidates by demanding evidence of public support before permission to be listed on the ballot is granted. *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970,

---

**12.** Theoretically, these rights retain their fundamentality. However, the analytic framework developed by the Supreme Court for examining an election law regulation often means that when voting rights are burdened by a restriction, they are not afforded the same level of protection

generally guaranteed fundamental rights. Practically speaking, therefore, it is correct to say that fundamentality is not inherent to voting rights but is dependent upon the degree of burden imposed on those rights.

1976, 29 L.Ed.2d 554 (1971). And, especially in general elections—contests that are reserved for major contenders—states are expected to condition access to ballot on proof of sufficient voter support. *Munro v. Socialist Workers Party*, 479 U.S. 189, 196, 107 S.Ct. 533, 537–38, 93 L.Ed.2d 499 (1986) (citing *Storer v. Brown*, 415 U.S. at 735, 94 S.Ct. at 1281–82). Moreover, the Supreme Court has stressed that the Constitution protects real and not mere theoretical access to the ballot. *American Party v. White*, 415 U.S. 767, 783, 94 S.Ct. 1296, 1307, 39 L.Ed.2d 744 (1974). It is only when a restriction on access to ballot "operate[s] to freeze the political status quo" that it should be held to be invalid. *Jenness v. Fortson*, 403 U.S. at 438, 91 S.Ct. at 1974.

By restraining the reach of access to ballot claims, the Supreme Court has recognized the importance of state regulatory control over elections. The states' constitutional power to regulate elections is justified as a way to ensure orderly, rather than chaotic, operation of the democratic process. *Storer v. Brown*, 415 U.S. at 730, 94 S.Ct. at 1279.[13] Indeed, "structuring elections in a way that avoids 'confusion, deception, and even frustration of the democratic process,'" is not merely a legitimate but a "compelling [state] interest." *LaRouche v. Kezer*, 990 F.2d 36, 39 (2d Cir.1993) (quoting *Jenness v. Fortson*, 403 U.S. at 442, 91 S.Ct. at 1976); *see also*, *American Party v. White*, 415 U.S. at 782 n. 14, 94 S.Ct. at 1307 n. 14. States may enact complex and comprehensive election codes, and while an election law might affect an individual's rights to vote and to associate for political ends, state interests are generally sufficient to justify the restrictions. *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 1569–70, 75 L.Ed.2d 547 (1983). Therefore, the Constitution will only condemn a restriction "that, without compelling justification, *significantly encroach[es]* upon the rights to vote and to associate for

political purposes." *Unity Party v. Wallace*, 707 F.2d 59, 62 (2d Cir.1983) (emphasis added).

**B. Analyzing NAP's Challenge to Section 116**

**1. The Analytic Framework**

Because constitutional protection is dependent not on the question of the voting rights' fundamental nature but on the extent to which a restriction impinges upon exercise of those rights, the Supreme Court established a balancing test for distinguishing valid from invalid restrictions. *Anderson v. Celebrezze*, 460 U.S. at 789, 103 S.Ct. at 1570. First, a court weighs "the character and magnitude of the asserted injury" to plaintiff's constitutional rights. *Id.* Then, the court "identif[ies] and evaluate[s] the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* At that point, the court may "determine the legitimacy and strength of those interests," as well as "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

In other words, it is only after examining the full impact a regulation has on the exercise of voting rights, that a court may invoke the proper level of scrutiny. When voting rights are "severely" burdened by election law restrictions, heightened scrutiny applies and "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick v. Takushi*, —— U.S. at ——, 112 S.Ct. at 2063 (quoting *Norman v. Reed*, 502 U.S. 279, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992)). In contrast, where the challenged regulation "imposes only 'reasonable nondiscriminatory restrictions'" on voting rights, minimal scrutiny applies and "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* —— U.S. at

---

13. State regulation of elections has been derived from Art. I, § 4, cl. 1 of the United States Constitution, which reads: "The Times, Places and Manner of holding elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." *Burdick v. Takushi*, —— U.S. at ——, 112 S.Ct. at 2063 (citing *Sugarman v. Dougall*, 413 U.S. 634, 647, 93 S.Ct.

2842, 2850, 37 L.Ed.2d 853 (1973)); *New York State Democratic Party v. Lomenzo*, 460 F.2d 250 (2d Cir.1972). State regulatory power has also been grounded in Art. I, § 2, cl 1 which provides that states are given the initial task of determining the qualifications of voters who elect members of congress. *Storer v. Brown*, 415 U.S. at 729–30, 94 S.Ct. at 1278–79.

———, 112 S.Ct. at 2063–64 (quoting *Anderson v. Celebrezze,* 460 U.S. at 788, 103 S.Ct. at 1570).[14]

2. *NAP's Claims*

NAP contends that its constitutional rights have been significantly impaired under New York's ballot placement methods because it has been denied access to the preferred positions on the ballot. It alleges that Section 116 has a significant impact on its First and Fourteenth Amendment voting rights and warrants heightened scrutiny insofar as "in New York, 'ballot access' *means* 'ballot status.'" Memorandum in Support of Plaintiffs' Motion for Summary Judgment at 17 (emphasis in original). Under New York's Election Law, independent body candidates must comply with petitioning requirements in order to obtain access to the ballot. According to NAP, these petitioning requirements are onerous and drain its financial resources. As a result, NAP claims it can presently only gain access to the ballot for a handful of candidates. All of these burdens, NAP contends, are a result of Section 116 impeding its opportunity for growth. Plaintiff surmises that were it able to increase its gubernatorial vote by tallying over 50,000 votes, it would "be able to field not handfuls, but hundreds of candidates in subsequent general elections." *Id.* at 18.

In addition, plaintiff alleges that its equal protection rights have been violated by an unconstitutional two-tiered ballot. According to NAP, under Section 116, a vote for an independent body gubernatorial candidate is diluted relative to votes cast for the party candidates, because performance in the gubernatorial race determines placement in future elections only for parties and not for independent bodies. Moreover, plaintiff asserts that by limiting the lottery mechanism to independent bodies, the State deceives "anti-party" voters. NAP speculates that these voters are likely to vote for the most viable non-party candidate and will incorrectly infer from the first part of the ballot that all organizations on the ballot are arranged according to past performance.

(a) *The Character and Magnitude of the Alleged Injury*

This Court finds that NAP has suffered no injury to its constitutional rights. It does not claim to have been excluded from the ballot or to have been unable to fairly obtain access to the ballot. The State has in no way prevented NAP from making its views known to the public or prevented its supporters from voting for the candidate of their choice. All that plaintiff really alleges is that its opportunity to capture the windfall vote has been impeded. While access to ballot may, at times, be afforded constitutional protection, access to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not a constitutional concern. Indeed, it should not be. The Constitution does not protect a plaintiff from the inadequacies or the irrationality of the voting public; it only affords protection from state deprivation of a constitutional right. "Voters have no constitutional right to a wholly rational election, based solely on a reasoned consideration of the issues and the candidates' positions, and free from other 'irrational' considerations as a candidate's ethnic affiliation, sex, or home town." *Clough v. Guzzi,* 416 F.Supp. at 1067.

(b) *The State's Interests*

Because no constitutional right has been impaired, the Court need not balance any alleged injury against the State's interest before determining the proper level of scrutiny.[15] Nevertheless, this Court takes note of

**14.** *Anderson* made no distinction between claims brought under the right to vote and the right to associate politically as opposed to claims brought under the Equal Protection Clause. Inasmuch as plaintiff's allegations are premised under both constitutional grounds, the Court will apply the balancing test for both.

**15.** The *Anderson* test assumes that a constitutional right is being burdened whenever a state regulates elections. It is premised on the belief that "[e]ach provision of these [election law] schemes, whether it governs the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze,* 460 U.S. at 788, 103 S.Ct. at 1570. As the instant case indicates, however, there are election law regulations which do not burden consti-

the compelling nature of the State's interest in organizing a comprehensible and manageable ballot. A manageable ballot is one where the parties, offices and candidates are presented in a logical and orderly arrangement. Were the ballot to be arranged in a scattershot fashion, the average voter would be unable to discern an underlying rationale to the ballot's organization. Identifying candidates who can demonstrate the support to qualify for party affiliation and separating them from those who cannot is one method of keeping the ballot in a format that the voter can easily read and assimilate.

### (c) Extent to which the Interests Burden the Rights

Plaintiff's argument that its injuries outweigh the State's interests in preventing voter confusion and creating a manageable ballot is, at best, conjectural. The status of NAP is determined not so much by the State's ballot placement methods as by the independent body's performance at the polls. To attribute their inability to gather 50,000 votes—less than one percent of registered voters in New York State—to the State's regulation of elections is akin to a professional football team blaming its loss in a playoff game and its elimination from Super Bowl contention on its opponent's home-field advantage. Under N.F.L. rules, home-field advantage in the playoffs is granted to the teams with the best regular season records. Home turf might have an effect on performance, but the key ingredients to a team's achieving the status of Super Bowl competitor are talented players, a skilled coach and supportive fans. Likewise, NAP itself, its candidates and its policies are the most important factors in determining the extent to which it upgrades its status from an independent body to a party. The independent body can improve its performance in elections and become a party by informing voters of its policies and by publicizing its candidates for office. To this extent, the State's interest in managing the ballot does not burden NAP's rights to vote, associate politically and develop itself as a party any more than the NFL's rule granting home-field advantage burdens the visiting team's ability to play, practice and develop into a championship contender.

The State's regulatory interests also do not burden NAP's equal protection rights. In claiming that its supporters' votes are diluted relative to the votes cast by party candidates, NAP relies on the reapportionment cases in which states have been found to have quantitatively diluted the weight of votes by malaportioning legislative districts. *See, e.g., Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964) ("the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."). When districts are malaportioned there is arithmetical dilution of the vote and a violation of the "one man one vote" principle, because the same number of representatives will be elected from legislative districts of unequal size. "[T]he Constitution calls for one person's vote to be worth as much as another's as nearly as is practicable ... and that, in apportioning legislative seats through districting, a state must make a good faith effort to achieve the goal of 'one-person, one-vote.'" *City of New York v. U.S. Dep't of Commerce,* 34 F.3d 1114, 1127 (2d Cir.1994).

Yet, the reapportionment cases have already been held to be inapposite to position bias. The victims of reapportionment are the voters of the larger district, whose votes actually count for less representation than

---

tutional rights and as such render the *Anderson* test superfluous.

Indeed, it appears that the Supreme Court has, at times ignored the *Anderson* test entirely and applied the traditional two-step analysis in assessing constitutional scrutiny. In *Eu v. San Francisco County Democratic Cent. Committee,* 489 U.S. 214, 222, 109 S.Ct. 1013, 1019–20, 103 L.Ed.2d 271 (1989) (citations omitted), the Supreme Court followed such a course: "To assess the constitutionality of a state election law, we first examine whether it burdens rights protected by the First and Fourteenth Amendments. If the challenged law burdens the rights of political parties and their members, it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest and is narrowly tailored to serve that interest." When the regulation does not burden these rights, the Court simply examines the challenged regulation under the rational basis test.

votes cast in the smaller district. No such dilution of the value of one's vote exists in the context of position bias because an irrational vote is just as much of a vote as a rational one. *Ulland v. Growe*, 262 N.W.2d at 416. Moreover, in the reapportionment context, the victims experience inescapable inequality because "the district lines and populations [are] fixed and the effects of malaportionment [are] unavoidable for voters within the disadvantaged districts." *Clough v. Guzzi*, 416 F.Supp. at 1067. No such unavoidability exists where an independent body has access to windfall voters and may be able to educate them and eradicate the supposed effects of position bias. *Id.*

NAP's contention that its constitutional rights have been impaired by a lottery system that misleads anti-party voters is nothing but pure speculation. Is there really a class of voters who shun a political organization just because it amassed 50,000 votes in the last gubernatorial election? Indeed, that New York only requires a threshold of 50,000 votes for a political organization to become a party demonstrates the State's lenient ballot access requirements. New York is not merely a two-party state, it has five parties. Were one inclined to vote against the major parties, he or she might conclude that the minor parties—the Conservative, Liberal and Right to Life—are a more effective outlet as a protest vote.[16] More importantly, the Supreme Court has rejected the view that a burden on the ability to cast a "protest vote" is unconstitutional. It recently wrote: "the function of the election process is 'to winnow out and finally reject all but the chosen candidates,' not to provide a means of giving vent to 'short-range political goals, pique or personal quarrel[s].'" *Burdick v. Takushi*, —— U.S. at ——, 112 S.Ct. at 2066 (quoting *Storer v. Brown*, 415 U.S. at 735, 94 S.Ct. at 1282). In short, on no account can it be said that the State's interests in creating a manageable ballot burden plaintiff's constitutional rights.

**16.** In fact, New York distinguishes not only between parties and independent bodies but between major parties and minor parties. "The term 'major political parties' means the two parties which polled for their respective candidates

## C. *The Constitutionality of Section 116*

Inasmuch as Section 116 imposes no restrictions—or only reasonable ones, if any at all—on NAP's First and Fourteenth Amendment rights, it is subject to minimal scrutiny. The challenged statute need only bear "some rational relationship to a legitimate state end" and will only be struck down as constitutionally invalid if it is "based on reasons totally unrelated to the pursuit of this goal." *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). Moreover, the State need not make a particularized showing of the existence of voter confusion in justifying the regulation. *Munro v. Socialist Workers Party*, 479 U.S. at 194–95, 107 S.Ct. at 536–37. "Legislatures ... should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Id.* at 195–96, 107 S.Ct. at 537.

Clearly, Section 116 is rationally related to the State's compelling need to construct and order a manageable ballot and prevent voter confusion. A statute that positions parties in all races based on performance in the prior gubernatorial election assists voters by constructing a symmetrical pattern on the ballot. For example, on the ballot used in New York City and Albany during the 1992 general elections, Appendix A, *infra*, no matter what the race, the Democratic Party was always listed first. Such an arrangement, however, did not ensure Democratic hegemony over the entire election. They may have captured the presidency in 1992, but in New York, a Republican was re-elected senator. That Senator D'Amato was an incumbent probably added a boost to his campaign, but that he was precluded from the supposedly advantageous first position on the ballot seems not to have hindered his performance. Indeed, an even more compelling defense of New York's ballot placement mechanism can be found in New York City's 1993 Mayoral race. In that election, a Re-

for the office of governor the highest and the next highest number of votes at the last preceding election for such office." N.Y.Elec.Law § 1–104(24).

publican challenger defeated a Democratic incumbent, even though the Democrats were listed first.

Statutes that link a party to a given column or row on a ballot should not be confused with incumbent first formats, in which first place is allotted in every race to the incumbent, regardless of party affiliation. Incumbent first statutes do not produce a symmetrical ballot. Even were all incumbents to be from the same party, there is no guarantee that the remaining parties would be listed in a parallel order. A voter who rationally casts his votes by allegiance to party will have a more burdensome task of finding his candidates of choice under the incumbent first method than on a format which allots a particular column on the ballot to each party. It could be reasonably argued, if position bias does exist on a ballot, that incumbent first statutes are really intended to suppress opposition by freezing the status quo, not to prevent voter confusion.

In this action, plaintiff encourages this Court to find that Section 116, which links a party's position to a particular column or row, also seeks to hide its true objective of unfairly advantaging incumbents behind a veneer of preventing voter confusion. NAP cites *McLain*, in which the Eighth Circuit reviewed a number of North Dakota election provisions, including a statute that resembles Section 116, to support its argument. That statute "reserve[d] the 'first or left-hand column' of the ballot for the party which received the most votes in the last congressional election, the second column for the party with the next greatest number and so forth." *McLain v. Meier*, 637 F.2d at 1166. There, as in the instant action, the appellant contended that it had access to the ballot but that it was disadvantaged by position placement. Although acknowledging that the rational basis test had to be used to scrutinize the statute, the Eighth Circuit nevertheless found the ballot placement method unconstitutional. It reasoned that the statute was an "incumbent first" statute, and, as such, was designed to serve the convenience of those voters who support incumbents and not, as North Dakota asserted, to create a convenient and intelligible ballot. *Id.* at 1167.

This Court believes that the Eighth Circuit's analysis of the North Dakota's statute is flawed. First, as previously noted, the Supreme Court has held that prevention of voter confusion is not merely a legitimate but a *compelling* state interest, which need not be supported by particularized evidence. It is difficult to understand how *McLain* could simply overlook the strength of this interest, especially when invoking the rational basis test. Second, *McLain* did not involve an incumbent first statute. The Eighth Circuit, itself, highlighted that under the statute at issue "the political party which captures North Dakota's congressional race in one election is listed first in *all* races in the next election." *Id.* at 1166 (emphasis in original). In North Dakota, all candidates from the party that prevailed in the previous congressional election were slotted first, regardless of whether they were incumbents. As a result, the North Dakota statute, as is true of Section 116, ensured that all races on the ballot were listed symmetrically.

Like the statute in *McLain*, Section 116 is not an incumbent first statute. Its stated purpose—to create a logical and manageable ballot, thereby preventing voter confusion—is reasonable enough to withstand rational basis scrutiny. Indeed, an organized ballot is of utmost importance in the administration of a democracy. If position bias exists, the ballot still does not necessarily benefit the most successful candidate—i.e. the incumbent; it benefits a party. That a ballot is arranged by party affiliation means that voters are automatically afforded more information about the candidate. They can identify his or her views as part of a political agenda or philosophical approach and thereby engage in more rational voting behavior. Therefore, the Court deems it rational for a state to arrange its parties on a ballot according to their performance in a past election.

Rational voting behavior may also be fostered by a two-tiered ballot in which recognized parties are listed before independent bodies. As another case involving NAP noted, "a State need not, and indeed probably should not, treat minor parties and independents the same as major parties." *New Alli-*

*ance Party v. Hand,* 933 F.2d 1568, 1575 (11th Cir.1991). In fact, courts have consistently upheld two-tiered ballot placement schemes as constitutionally valid under the Equal Protection Clause. *See, e.g., Bd. of Election Comm'rs v. Libertarian Party,* 591 F.2d 22, 25 (7th Cir.1979) (upheld ballot placement plan that listed the two established political parties before the new parties). In *Libertarian Party,* the Seventh Circuit explained that a two-tiered ballot can prevent voter confusion by ensuring that there are no gaps on the ballot between the names of candidates competing for specific offices, since many of the minor parties run candidates in only a few elections. The court stated: "[T]he relatively slight disadvantage that may result from placement below the top two ballot positions is more than outweighed by the state's interest in assuring the quality of the election." *Id.* at 27. Positioning parties in some logical fashion is crucial to an efficient ballot. A ballot should not be formatted like a dartboard; it must have a sensible order to it, one in which, for example, candidates are coordinated spatially by party and office. The ballot should enable the voter to easily and effectively identify the candidate of his or her choice. Thus, to assure the orderly conduct of elections, a State may design a ballot which rationally distinguishes between those entities that previously attracted significant public support and those that did not.

Another North Dakota statute examined in *McLain* underscores that providing disparate treatment for party nominees and independent candidates on a ballot is constitutional. *McLain v. Meier,* 637 F.2d at 1168. Under the statute, party candidates were allotted their own column, but all independent candidates were grouped together in one column. Similar to plaintiff in this action, the independent candidate challenging the statute contended that the two-tiered scheme relegated independents to an obscure and insignificant position on the ballot. The Eighth Circuit, however, found the mechanism to be rationally related to the State's interest in ordering a manageable ballot. It noted that separating independents from party candidates serves an informational function by demonstrating to the public those candidacies which have exhibited "the modicum of support required to qualify as a party candidate." *Id.* So too, in Section 116, differentiating between parties and independent bodies provides a useful informational function that facilitates more informed and rational voting behavior.

More importantly, *McLain* understood that a two-tiered ballot is often necessary to promote a manageable election. Including independents, eleven presidential candidates were listed on the North Dakota ballot in 1976. Due to the large number of candidates, the Eighth Circuit concluded that the ballot was likely to become unwieldy and, as a result, the state's concern over voter confusion had to be given more weight. The analysis supplied in *McLain* demonstrates why a scheme like New York's, which may result in double rowing or double columning, is not irrational. Voting machines do not have endless space. When an election involves many candidates, such as a presidential race, there are bound to be some doubled-up candidates. Because only the major parties generally run full slates of candidates, it would be inefficient to double column or double row them.

Thus, it is apparent that Section 116 is rationally related to the creation of a manageable ballot. NAP has failed to show why the Court should scrutinize New York's ballot placement methods under a more heightened analysis. Preferred position on a ballot, if such a thing exists, is simply not protected by the Constitution. By trying to convince this Court, through conjecture and unsupported claims, that its attack on the statute is of constitutional dimension, plaintiff appears to be transplanting a political grievance to a judicial forum. What seems to disturb NAP is that it cannot muster 50,000 votes in a gubernatorial election so that it can be classified as a party. Assuring NAP political success is beyond the scope of this Court; NAP is accountable for its own destiny. In the words of Jean Paul Sartre: "Man can will nothing unless he has first understood that he can count on no one but himself." *Being and Nothingness* (1943).

## CONCLUSION

For the foregoing reasons, NAP's motion for summary judgment is denied and the State's motion to dismiss the complaint is granted. This Court finds that N.Y.Election Law § 7–116 does not violate plaintiffs' constitutional rights under the First and Fourteenth Amendments.

It is so ordered.

## APPENDIX A

**INSTRUCTIONS**

**INSTRUCCIONES**

| | A ★ DEMOCRATIC | B ✊ REPUBLICAN | C ✊ CONSERVATIVE | D ✊ RIGHT TO LIFE | E ▲ LIBERAL | F ▲ LIBERTARIAN | G ✓ NO PARTY | H SWP SOCIALIST WORKERS |
|---|---|---|---|---|---|---|---|---|
| **1** President and Vice President | ★ DEMOCRATIC Bill Clinton / Al Gore 1A | ✊ REPUBLICAN George Bush / Dan Quayle 1B | ✊ George Bush / Dan Quayle 1C | ✊ George Bush / Dan Quayle 1D | ▲ Bill Clinton / Al Gore 1E | ▲ LIBERTARIAN Andre Marrou / Nancy Lord 1F | ✓ James B. Stockdale 1G | SWP Estelle DeBates 1H |
| **6** United States Senator | ★ DEMOCRATIC Robert Abrams 6A | ✊ Alfonse M. D'Amato 6B | ✊ Alfonse M. D'Amato 6C | ✊ Alfonse M. D'Amato 6D | ▲ Robert Abrams 6E | ▲ Norma Segal 6F | ✓ Mohammad T. Mehdi 6G | SWP James Mac Warren 6H |
| **9** United States Representative | ★ Irving S. Aronin 9A | ✊ Irving S. Aronin 9B | ✊ Irving S. Aronin 9C | | ▲ Irving S. Aronin 9E | ▲ Stanley Nation 9F | | |
| **10** | ★ Elliott Golden 10A | ✊ Elliott Golden 10B | ✊ Elliott Golden 10C | | ▲ Elliott Golden 10E | | | |
| **11** | ★ Edward K. Pincus 11A | ✊ Edward K. Pincus 11B | ✊ Edward K. Pincus 11C | | ▲ Edward K. Pincus 11E | | | |
| **12** | ★ Barry A. Cutler 12A | ✊ Carl DiCarlo 12B | ✊ Kenneth Wolff 12C | | ▲ Carl Cutler 12E | | | |
| **13** Justices of the Supreme Court | ★ Michael Julas Garson 13A | ✊ Jay R. Berman 13B | ✊ Anthony A. Labella, Jr. 13C | | ▲ Michael Julas Garson 13E | ✓ John J. Hopkins 13G | | |
| **14** | ★ Gloria Goldstein 14A | ✊ Gloria Goldstein 14B | ✊ Gloria Goldstein 14C | | ▲ Gloria Goldstein 14E | ✓ Lenora B. Fulani 14G | | |
| **15** | ★ William F. Mastro 15A | ✊ William F. Mastro 15B | ✊ William F. Mastro 15C | | ▲ Miguel A. Gonzalez 15E | | | |
| **16** Judge of the Civil Court | ★ Margaret M. Conner 16A | ✊ Margaret M. Conner 16B | ✊ James P. McColl 16C | | ▲ Margaret M. Conner 16E | | | |
| **17** | ★ Karen R. Yellen 17A | ✊ James C. Leconto 17B | ✊ James C. Leconto 17C | | ▲ Karen R. Yellen 17E | | | |
| **18** | ★ Margarita L. Torres 18A | | | | | | | |
| **19** Representative in Congress | ★ Major R. Owens 19A | ✊ Michael Gaffney 19B | ✊ Michael Gaffney 19C | | ▲ Major R. Owens 19E | ✓ Ernest N. Foster 19G | | |
| **20** | ★ Marty Markowitz 20A | ✊ Kenneth E. Cook 20B | ✊ Kenneth E. Cook 20C | | ▲ Yvonne Murray 20E / Lorraine Stevens 21E | | | |
| **21** Lot K144 | | | | | ✓ Jeannette Hottogs PEOPLE'S CHOICE 21M | | | ✓ Roger Green 21N |

## APPENDIX B

Democratic — A

Republican — B

Conservative — C

Right To Life — D

Liberal — E

Libertarian — F

Independent Parties

No Party — G

New Alliance

Socialist Workers — H — SWP

Natural Law — I

| 1 & 2 Electors for President and Vice President of the United States (4 YEAR TERM) (VOTE ONCE) | | 4 United States Senator (6 YEAR TERM) (VOTE FOR ONE) | 5 | 6 & 7 Justices of the Supreme C (14 YEAR TERM) (VOTE FOR ANY FOUR) | | |
|---|---|---|---|---|---|---|
| 1A For President CLINTON For Vice President GORE Democratic | | 4A ABRAMS | 5A GREEN | 6A DOYLE, JR. | 7A GOSS | |
| 2B For President BUSH For Vice President QUAYLE Republican | | 4B D'AMATO | 5B GREEN | 6B DOYLE, JR. | 7B GOSS | |
| 1C For President BUSH For Vice President QUAYLE | | 4C D'AMATO | 5C GREEN | 6C DOYLE, JR. | 7C GOSS | |
| 1D For President BUSH For Vice President QUAYLE | | 4D D'AMATO | 5D BEHR | | | |
| 1E For President CLINTON For Vice President GORE Liberal | | 4E ABRAMS | 5E GREEN | 6E DOYLE, JR. | 7E GOSS | |
| 1F For President MARROU For Vice President LORD | | 4F SEGAL | | | | |
| 1G For President PEROT For Vice President STOCKDALE | 2G For President Lenora B. FULANI For Vice President MUNOZ | 4G Mohammad T. MEHDI New Alliance | | | | |
| 1H For President MacWARKER For Vice President DEBATES | | 4H by WARREN | | | | |
| 1I For President HAGELIN For Vice President TOMPKINS | | 4I NELSON | | | | |